## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANN V. SHEEHAN, | : | Civil No. 1:22-CV-1871 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SHIPPENSBURG UNIVERSITY, *et al.*, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Before the court is the motion for summary judgment filed by Defendants Shippensburg University ("Shippensburg"), Laurie Porter ("Porter"), and Nipa Browder ("Browder") (collectively, "Defendants"). (Doc. 34.) This case alleges Americans with Disabilities Act ("ADA"), Pennsylvania Human Relations Act ("PHRA"), Rehabilitation Act ("RA"), and Family and Medical Leave Act ("FMLA") violations against Shippensburg stemming from its refusal to allow Plaintiff Ann Sheehan ("Sheehan") to work her job as department secretary for the Psychology Department of Shippensburg University remotely due to complications she may have faced from the COVID-19 virus. (*See* Doc. 7.) For the reasons that follow, the motion will be granted.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

Plaintiff Ann Sheehan began working as the Shippensburg University's psychology department secretary in August 2018.[2]  (Doc. 36, ¶ 2.)  Dr. Suzanne Morin, the chair of the psychology department, was Sheehan's supervisor.  (*Id.* ¶ 3.)  Shippensburg contends that the department secretary performed many in-person duties, such as "greeting and interacting with visitors to the psychology department office, handling physical mail, filing documents, distributing and collecting keys, running errands on campus, making photocopies, answering the desk phone, posting signs, proctoring exams, and supervising student employees." (*Id.* ¶ 6.)  Sheehan does not contest that the department secretary performs these duties, but rather, contends that "[t]hese were tasks delegated, at times, to Ms. Sheehan when she was in the office.  However, they were not exclusively her tasks nor were they dependent solely on her being in-office to be accomplished." (Doc. 38, ¶. 6.)  Otherwise, Sheehan contends that her duties were focused on "data entry, database management, and other computer-based tasks."  (*Id.* ¶ 7.)

---

[1] Many of the facts in this case are not disputed.  Where facts are not disputed, the court cites to Defendants' statement of material facts, Doc. 36, with the implicit recognition that Sheehan admitted these facts in her response to Defendants' statement.  (Doc. 38.)  The court draws all reasonable inferences in favor of the non-movant, Sheehan.  *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

[2] Plaintiff notes that her job was actually styled as a "Clerk Typist 2."  This is supported by the job description provided by both parties.  (Docs. 36-3, 38-4.)  For ease of reference, the court will call Sheehan's position "department secretary" since the parties colloquially refer to it as such.  However, this is with the understanding that the position is technically classified as "Clerk Typist 2" in accordance with the job description.

In March 2020, Shippensburg's campus shut down because of the COVID-19 pandemic.  (Doc. 36, ¶ 8.)  All employees, including Ms. Sheehan, were permitted to work remotely.  (*Id.* ¶ 9.)  In the fall of 2020, Shippensburg reopened its campus, gave students the option to either attend in person or online, and offered its employees a "flexible work policy," which allowed employees to ask for the ability to work remotely.  (*Id.* ¶¶ 10–13.)  Sheehan requested, and was granted, the ability to work remotely until May 2021, at which time the flexible work policy ended.  (*Id.* ¶¶ 14, 15.)  During this time period, specifically, the 2020 to 2021 school year, when some, but not all, students and faculty were on campus, Sheehan worked remotely.  (*Id.* ¶ 16.)

While working remotely, Sheehan could not perform the in-person tasks of her job, so student workers sometimes performed them.  (*Id.* ¶ 18 19.)  Sheehan admits that while she was working remotely, her duties were not performed or had to be covered by other secretaries working overtime.  (*Id.* ¶ 22.)  The number and availability of the student workers is disputed.  Shippensburg contends that it had at most one student worker at a time and that student could only work a maximum of seven hours a week when classes were not in session.  (*Id.* ¶ 21.)  Sheehan contends that while it is true the psychology department had at most one student worker, it also had three graduate assistants who could cover Sheehan's in-person

tasks and her tasks could also be delegated to other secretaries.

(Doc. 38, ¶¶ 20, 21.)

In May 2021, when the flexible work policy ended, Sheehan returned to work in person.  (*Id.* ¶ 23.)  In the fall of 2021, the entire psychology department also returned to in-person work.  (*Id.* ¶ 24.)  On December 15, 2021, Sheehan emailed Nipa Browder from Shippensburg's Human Resources department requesting to again work from home due to a new COVID-19 variant.  (*Id.* ¶ 26.) Browder responded by stating that the flexible work policy had ended, and Sheehan would need to apply for an accommodation under the ADA in order to work from home.  (*Id.* ¶ 27.)  Browder directed Sheehan to the necessary forms required to seek an accommodation under the ADA.  (*Id.*)  Sheehan returned the "Reasonable Accommodation Request Form" in which Sheehan noted that her "condition affects my cardiovascular and digestive systems.  I would expect the duration to be no longer than the length of the pandemic surge."  (Doc. 36-8, p. 3.) In response to a question about how her condition impacts her ability to perform essential functions of her job, Sheehan stated that "if I were to become ill with Covid my life may be endangered due to my high risk of complications."  (*Id.*) Sheehan also provided a note from her doctor which, in its totality, provides "Ann Sheehan was seen in the office on 12/13/21.  Restrictions: Recommend work from

home due to COVID pandemic surge due to her high risk of complications should she contract the disease." (Doc. 36-9, p. 3.)

On December 16, 2021, after receiving the above documentation, Browder advised Sheehan that Sheehan's medical provider would need to fill out a "Health Care Provider Questionnaire." (Doc. 36, ¶ 31.) Sheehan replied that she is "very careful about safeguarding my personal information in all aspects of my life, and especially my medical information." (Doc. 36-10, p. 2.) She also noted what she viewed as deficiencies in the form due to its failure to "take into account" the COVID-19 pandemic. (*Id.*) Sheehan sent the questionnaire to her doctor with a cover letter advising her doctor that she safeguards her personal information and found the questionnaire to be "an over-reach." (Doc. 36-12.) This form was returned to Shippensburg University on December 27, 2021. (Doc. 36, ¶ 37.) Her doctor completed the questionnaire, listing Sheehan's physical impairments as "palpitations, tachycardia, B-12 anemia." (Doc. 36-12, p. 4.) However, the doctor checked "no" in response to whether these impairments substantially limited a major life activity and did not complete any of the follow up questions regarding how the impairment impacted Sheehan's activities. (*Id.*) The doctor again recommended "work from home due to COVID pandemic surge due to her high risk of complications should she contract the disease." (*Id.* at 5.)

While Sheehan was engaging in the ADA process, she also inquired about using FMLA sick leave, among other options.  (Doc. 36, ¶ 42.)  In response to this email, Laurie Porter, Shippensburg's Director of Human Resources, advised Sheehan that "[c]oncern of contracting Covid is not a disability under the ADA which would require the university to accommodate your work from home request." (Doc. 36-11, p. 3.)  Porter further advised Shippensburg would continue to work through the ADA process, offered "plexiglass barriers" around her work area, and additionally noted that Sheehan's position is "student facing" and with all students and faculty present on campus, "remote work may not be a reasonable accommodation." (*Id.* at 4.)  In response to this offer of a plexiglass barrier, Sheehan noted that she was "finding recent studies that say the guards can actually trap contaminated air around the person behind the screen and they have not been shown to reduce exposure to aerosole [sic] droplets." (*Id.* at 3.)

Shippensburg HR directed Sheehan to complete a request for FMLA leave form as well as an "Employee Serious Health Condition Certification."  (Doc. 36, ¶ 46.)  Sheehan returned the form on January 3, 2022, and the certification on January 5, 2022.  (*Id.* ¶¶ 47, 49.)  The certification was completed by a different physician than the ADA questionnaire.  (*Id.* ¶ 50.)  This physician checked "yes" when asked if the patient was able to perform all of her job functions.  (Doc. 36-14, p. 3.)  In response to the direction "[d]escribe relevant medical facts, if any, related

6

to the condition for which the employee seeks leave" the physician wrote "[p]atient states due to her tachycardia and palpitations she does not feel comfortable working in the current setting during COVID and is requesting to work from home." (*Id.*) The physician indicated that full-time absence was not requested because "Pt is requesting to work from home." (*Id.*)

On January 5, 2022, Porter called Sheehan's doctor's office and was advised by an office support person that Sheehan had "no restrictions" that would prevent her from returning to work. (Doc. 36, ¶¶ 55, 56.) The same day, Porter, Browder, and Sheehan met via Zoom to discuss possible accommodations. (*Id.* ¶ 57.) Porter and Browder again offered the accommodations of a Plexiglas barrier around Sheehan's workspace. (*Id.* ¶ 58.) Browder also physically went to Sheehan's office to determine other precautions and spoke with Sheehan's supervisor, Dr. Morin, about whether Sheehan could perform her job at home. (*Id.* ¶¶ 59, 60.)

On January 6, 2022, Sheehan, via email, advised that she believed the Plexiglas barrier would be insufficient because of its inefficiency at protecting those standing behind the barrier as well as a concern of students not wearing masks in the hallways and a concern regarding the communal bathrooms. (Doc. 36-19, p. 2.) Sheehan noted her prior experience working from home and suggested that student workers or graduate assistants could cover her in-person duties. (*Id.*)

On January 10, 2022, Shippensburg denied Sheehan's request for ADA accommodation. (Doc. 36-17.) Shippensburg noted that the essential functions of "Clerk Typist 2" requires the individual to be present in the office. (*Id.*) Additionally, Shippensburg explained that prior periods of work from home were under the Governor's Emergency Declaration, which had expired, and thus, "any exception to working in-person are governed by the ADA." (*Id.*) The letter memorializing the denial of Sheehan's ADA request reflects the steps taken to accommodate Sheehan, as described above, and reaches the conclusion that Shippensburg was unable to provide a reasonable accommodation because Sheehan's "medical conditions do not constitute a disability under the ADA, nor do they qualify for accommodation under the ADA." (*Id.*) The letter specifically cites reviewing Sheehan's request and her "doctor's statement that your condition does not qualify as a disability," as the bases for denying her request. (*Id.*) The letter also outlined that Shippensburg had offered "environmental adjustments to your workspace[,]" but that Sheehan had rejected them. (*Id.*)

On January 11, 2022, Sheehan emailed Browder asking if "additional information from my doctor [would] be helpful – specific language about my heart and cardiovascular conditions and the effect and risks of Covid?" (Doc. 36-20, p. 2.) Later that same day, Browder sent a letter denying Sheehan's request for FMLA leave because "the certification you provided does not support that you

have a Serious Health Condition that currently qualifies for leave under the

FMLA." (Doc. 36-21, p. 2.)  The letter further outlined Sheehan's options of either

returning to work, applying for leave without pay, or resigning, as well as

accounted for how Sheehan's absences to the date of the letter would be charged

for purposes of leave.  (*Id.*)  Later in the day on January 11, 2022, Sheehan emailed

Porter, Browder, and Stephanie Jirard, Shippensburg's Chief Equity, Inclusion and

Compliance Officer and Title IX Coordinator, asking for the ADA denial to be

"reexamined." (Doc. 36-22.)

On January 13, 2022, Sheehan sent an "updated" Healthcare Provider

Questionnaire, in which the physician changed his answer from "no" Sheehan's

impairments did not substantially limit a major life activity to "yes." (Doc. 36-23,

p. 3.) This change was initialed.  (*Id.*)  The updated questionnaire also advised that

"patient needs to limit contact to public/other employees due to high risk of

COVID complications" in response to the question of what major life activities the

patient's impairments substantially limited.  (*Id.*)  In response to the question

"[p]lease describe the manner and extent to which the impairment limits the above-

described major life activity(ies)" the physician wrote "[r]ecommend allowing

work from home." (*Id.*)  In response to "[w]hat is your prognosis for whether and

in what manner the impairment will continue to limit the above-described major

life activity(ies)" the physician wrote "when the pandemic subsides, she should be

9

able to return[,]" and then estimated the duration of the impairment to be "1 year." (*Id.* at 3, 4.)  Finally, in response to "[h]ow does the impairment affect his/her ability to perform the essential functions of his/her job?" the physician wrote "[l]imiting access to potential COVID exposure limits her availability to do in-person office work."  (*Id.* at 4.)  The "updated" questionnaire did not contain an updated signature or date.  (*Id.*)  Sheehan states, with no evidentiary support, that the change in these two forms was a clerical error.  (Doc. 38, ¶ 40.)

As outlined in the letter denying Sheehan's FMLA leave request, Sheehan was directed to return to work on January 18, 2022.[3]  (Doc. 36, ¶ 77.)  Sheehan did not return to work.  On January 24, 202, Sheehan asked to appeal the denial of her ADA determination.  (*Id.* ¶ 80.)  Shippensburg advised that it had treated her updated questionnaire as a second request, rather than an appeal, and on January 28, 2022, Shippensburg denied Sheehan's second ADA request.  (*Id.* ¶¶81, 82.)

In the letter denying Sheehan's second ADA request, Shippensburg noted "[t]he request for an accommodation is unrelated to the ways that [the] tachycardia, heart palpitations, or B12 anemia impair or substantially limit a major life activity. Rather, an accommodation is sought to alleviate concerns related to COVID-19 because you may be at a greater risk of severe illness should you contract COVID-

---

[3] Sheehan disputes this fact by noting "[d]espite being aware of Sheehan's pending ADA Request for Accommodations, Defendants ordered Sheehan to either (1) return to work without defined accommodations, (2) use annual leave, or (3) resign her position."  (Doc. 38, ¶ 77.)

19." (Doc. 36-26, p. 2.) The letter also notes that, after conversation with Sheehan's physician's office, who stated she was under no restrictions, "it has been determined that your condition does not constitute a disability under the ADA as it has not been established that you have a substantial impairment that significantly limits or restricts a major life activity." (*Id.*) The letter continues that "[t]he only accommodation that you have been willing to accept is working from home. As working in the office is an essential function of your position, working from home is not a reasonable accommodation." (*Id.* at 3.) Finally, the letter again offers masks, plexiglass barriers, and other barriers to prevent individuals from entering Sheehan's office and advises that she must report to work on January 31, 2022, and she could face discipline up to and include termination if she fails to report. (*Id.*)

Sheehan did not report to work on January 31, 2022, but rather sent an email to Porter and Browder. (Doc. 36, ¶¶ 88, 89.) In this email, Sheehan wrote "[t]his is not a resignation letter but a reply to your recent letter[,]" and advised that she would not be reporting to work. (Doc. 36-27, p. 2.) Sheehan further contested "ideas" in the January 28, 2022, letter and noted she "would have gladly worked from home and returned to campus once omicron subsided[.]" (*Id.*) She further thanked them for the opportunity to work at Shippensburg and noted she enjoyed the experience. (*Id.*)

On February 4, 2022, Porter sent a letter to Sheehan noting her failure to return to work and advised of a pre-disciplinary conference ("PDC") which was to be held on February 7, 2022. (Doc. 36-28.) In an email on February 6, 2022, Sheehan advised that she would not be attending the meeting, largely because she felt there had been insufficient time to prepare for the meeting. (Doc. 36-29, pp. 2, 3.) On February 7, 2022, Porter sent a letter rescheduling the PDC for February 11, 2022. (Doc. 36, ¶ 92.) The second letter detailed the interactive process that had taken place to that date and noted that Sheehan had rejected the proffered accommodations. (Doc. 36-30, p. 2.) The letter advised Sheehan that if she failed to attend the meeting, a decision would be rendered with the information available at the time. (*Id.* at 3.) The letter noted that termination of her employment was a possible outcome and that she could have a union representative present, if she chose. (*Id.*) Sheehan replied to the letter via email on February 9, 2022. (Doc. 36-31.) In the response she contested the PDC process up to that time, rejected a Plexiglas barrier and again suggested having students or graduate assistants cover her in-person responsibilities. (*Id.* at 4.)

On February 11, 2022, Porter, Browder, Sheehan's supervisor Suzanne Morin, and Glenn Tucker, a union representative, attended the PDC, but Sheehan did not. (Doc. 36, ¶ 110; Doc. 36-35, p. 2.) On February 15, 2022, Shippensburg

12

terminated Sheehan's employment via letter.  (Doc. 36-34.)  The letter outlined the

ADA process and noted:

> The reason for [the ADA accommodation request] denials is that your
> essential job functions require you to work in the office, and your
> condition does not constitute a disability under the ADA.  You were
> therefore instructed to return to work on January 31, 2022.  You did not
> report to work as instructed and remain absent without approve[d] leave
> since that date.

(*Id.* at 2.)

Sheehan initiated this action via complaint on November 25, 2022.  (Doc. 1.)

Defendants answered the initial complaint on January 30, 2022.  (Doc. 6.)

Sheehan filed an amended complaint on February 17, 2023.  (Doc. 7.)  Defendants

answered the amended complaint on March 24, 2023.  (Doc. 13.)  The amended

complaint contains one count of disability discrimination under the PHRA against

all defendants, one count of disability discrimination under the RA against

Shippensburg University, one count of disability discrimination under the ADA

against Shippensburg University, one count of interference with rights under the

FMLA against Shippensburg University, and one count of aiding and abetting

under the PHRA against Defendants Browder and Porter.  (Doc. 7.)  Defendants

filed a motion for partial judgment on the pleadings, based on Sheehan filing her

initial complaint more than 90 days after her right to sue letter was issue, which,

after briefing, the court denied because Sheehan's untimeliness in filing her

complaint was due to extraordinary circumstances of "an unexpected maintenance period for CM/ECF." (Doc. 23, p. 4.)

Defendants filed the instant motion for summary judgment and supporting papers on January 31, 2025. (Docs. 34, 35, 36.) Sheehan filed her brief in opposition and response to statement of facts on February 21, 2025. (Docs. 37, 38.) Defendants filed a reply brief on March 21, 2025. (Doc. 41.) Accordingly, the motion for summary judgment is ripe and ready for disposition.

## JURISDICTION AND VENUE

This court has jurisdiction under 28 U.S.C. §§ 1331 because Sheehan brings claims arising under a federal statute. This court also has supplemental jurisdiction over the state law statutory claims under 28 U.S.C. § 1367 because they are related to the federal claims. Venue is appropriate under 28 U.S.C. § 1391 because all actions or omissions alleged occurred in the Middle District of Pennsylvania.

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary." *Id.* "A

14

dispute is genuine if a reasonable trier-of-fact could find in favor of the

nonmovant' and 'material if it could affect the outcome of the case." *Lichtenstein*

*v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts

in the light most favorable to the non-moving party and draw all reasonable

inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288

(3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher*

*Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)).  The court may not "weigh the evidence"

or "determine the truth of the matter." *Anderson*, 477 U.S. at 249.  Instead, the

court's role in reviewing the facts of the case is "to determine whether there is a

genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those

portions of 'the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The non-moving party must then

oppose the motion, and in doing so "'may not rest upon the mere allegations or

denials of [its] pleadings' but, instead, 'must set forth specific facts showing that

there is a genuine issue for trial.  Bare assertions, conclusory allegations, or

suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**DISCUSSION**

Defendants argue that they are entitled to summary judgment on all of

Sheehan's claims as a matter of law, largely due to Sheehan's failure to produce

sufficient evidence to prove her claims.  (Doc. 35, p. 6.)  Sheehan disagrees and

argues there are disputed issues of material fact that a jury must resolve.  (Doc. 37,

pp. 9, 10.)  The court will address each claim separately.

### A. PHRA, RA, and ADA Claims

Defendants argue that they are entitled to summary judgment on Sheehan's

PHRA, RA, and ADA claims for three reasons.[4]  First, Defendants argue that they

did not have knowledge that Sheehan was disabled under the ADA because of the

differing information presented by her physician's office.[5]  (Doc. 35, pp. 9–11.)

---

[4] The parties do not dispute that these three claims are all analyzed under the same standard and analyze them together throughout their briefs.  (*See* Doc. 35, p. 5 n.1; Doc. 37, p. 7.)  The court agrees.  *See Antol v. Perry*, 82 F.3d 1291, 1299 (3d Cir. 1996)(holding that the RA and ADA apply the same standard to determine liability) and *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999)(holding that analysis of an ADA claim applies equally to a PHRA claim).  For brevity, the court will analyze only the ADA claim, but notes that the analysis applies equally to the RA and PHRA.

[5] Although the court does not address this argument in disposing of the instant motion for summary judgment, it is worth noting that Shippensburg misunderstands this element.  The argument proffered by Shippensburg regarding this element is more akin to an argument that Sheehan does not meet the definition of qualified individual under the ADA because her physician represented to Shippensburg that her medical impairments did not substantially limit a major life activity.  *See* 42 U.S.C. § 12102(1) requiring that an individual's physical or mental impairment substantially limits one or more major life activities; Doc. 36-12.  The contention that Shippensburg did not "know" of Sheehan's purported disability and her desire for an accommodation is implausible, considering they engaged in an interactive process with her by virtue of having Sheehan complete multiple forms and participating in a meeting to discuss potential accommodations.  As Sheehan notes, the standard for whether an employer "knows" of an employee's disability is rather low, as "[t]he employer must have enough information to know

Second, Defendants argue that Sheehan's only requested accommodation, working from home, is unreasonable as a matter of law due to the essential functions of her position requiring in-person attendance.  (*Id.* at 11–15.)  Third and finally, Defendants argue that there is no evidence Shippensburg acted in bad faith throughout the ADA process.  (*Id.* at 15–19.)  Because it is dispositive of Sheehan's claim, the court will address only Defendants' second argument: whether Sheehan's requested accommodation was reasonable.

In support of its argument that Sheehan's proposed accommodation was unreasonable, Defendants argue that the position of department secretary entailed in-person responsibilities which were essential functions of the job.  (Doc. 35, p. 12.)  Defendants do not dispute that a student worker could perform some of these functions, but rather argue that the availability of the student worker was not sufficient to cover the totality of Sheehan's in-person duties, meaning these "duties either did not get done, or had to be done by secretaries from other departments." (*Id.* at 13.)  Defendants contend that hiring other workers or assigning other team members to cover essential functions is unreasonable as a matter of law.  (*Id.* at 14)

---

of 'both the disability and desire for an accommodation,' or circumstances must at least be sufficient to cause a reasonable employer to make appropriate inquiries about the possible need for an accommodation."  *Coneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 332 (3d Cir. 2003). Shippensburg may not have agreed that she met the legal definition of "disabled" under the statute, but they certainly knew that Sheehan had health concerns with she believed impacted her job and that she wished to change her work circumstances because of those concerns. *See Mills v. Temple Univ.*, 869 F.Supp.2d 609, 623 (E.D. Pa. 2012).

(citing *Niculcea v. Stone Ridge Towne Ctr.*, No. 22-1577, 2022 WL 17484289, at *

2 n.4 (3d Cir. Dec. 7, 2022)).  Finally, Defendants add that the indefinite period of

her absence "[c]ompound[s] the unreasonableness of her requested

accommodation[.]"  (*Id.*)

Sheehan discounts "the foundation" of Defendants' argument, that

Sheehan's position required in-person work, by noting that Defendants have

designated every task assigned to Sheehan was "essential" and that the job

description is not conclusive evidence of a position's essential functions.  (Doc. 37,

p. 15.)  Sheehan further argues that every case cited by Defendants for the

proposition that reallocating essential functions is not reasonable is inapplicable

because, here, Sheehan did not request the accommodation of reallocating essential

functions, but she rather "merely suggested reallocation of tasks not central to her

position as a Clerk Typist."  (*Id.* at 15, 16.)  Sheehan analogizes to *Deane v.

Pocono Med. Ctr.*, 142 F.3d 138, 148 (3d Cir. 1998), and argues that the essential

functions of her position were data entry and communications via phone or email.

(*Id.* at 16, 17.)  Sheehan also notes that the determination of what is an essential

function is typically left to a jury.  (*Id.* at 17.)

In reply, Defendants note that the written job description, Dr. Morin's

testimony, and Sheehan's admissions in her deposition support their argument that

the essential functions of a department secretary required being physically present.

(Doc. 41, p. 8.)  Defendants argue that the individuals suggested by Sheehan who could potentially cover her responsibilities all fall short.  First, the student workers did not work enough hours to cover all of her in person duties.  (*Id.* at 9, 10.)  Second, Sheehan was responsible to oversee graduate assistants, so having the same individuals perform her duties still required her to be present to oversee them.  (*Id.* at 9 n.3.)  Third, other secretaries would have to be paid overtime and could not cover all of her in-person responsibilities, such as answering the phone and interacting with students.  (*Id.*)  Defendants further argue that *Deane* is inapplicable here because the Third Circuit held summary judgment was improper based on "conflicting evidence ***about what the employee was actually required to do***," as opposed to the instant case, where the issue is how essential the in-person tasks are.  (*Id.* at 12, 13)(emphasis in Defendants' brief).

In relevant part, the ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  To establish a prima facie case of disability discrimination, the employee must establish that:

> "(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [s]he has suffered an otherwise adverse employment decision as a result of discrimination" . . . which in this context includes refusing to make reasonable accommodations for a plaintiff's disabilities.

*Hohider v. UPS, Inc.*, 574 F.3d 169, 186–87 (3d Cir. 2009) (citations omitted). Following a qualified individual's request for an accommodation, the employer "must make a reasonable effort to determine the appropriate accommodation," which is "best determined through a flexible, interactive process." *Id.* (quoting *Taylor*, 184 F.3d at 311.)

The parties argue the third prong: whether Shippensburg discriminated against Sheehan by virtue of refusing to accommodate her disability. One type of discrimination is failing to participate in the interactive process. *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 504 (3d Cir. 2010). An employee can establish her employer failed to participate in the interactive process by showing: "(1) [s]he was disabled and [her] employer knew it; (2) [s]he requested an accommodation or assistance; (3) [her] employer did not make a good faith effort to assist; and (4) [s]he could have been reasonably accommodated." *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006). To show she could have been reasonably accommodated, a plaintiff must show that the proposed accommodation is possible, and that "the costs associated with [her] proposed accommodation 'are not clearly disproportionate to the benefits it will produce.' The term 'costs' includes financial as well as administrative burden on a company." *Gaul v. Lucent Tech., Inc.*, 134 F.3d 576, 580–81 (3d Cir. 1998)(citations omitted). "Summary judgment may be granted for a defendant only 'in cases in which the plaintiff's

proposal is either *clearly ineffective* or *outlandishly costly.*'" *Skerski v. Time Warner Cable Co., a Div. of Time Warner Ent. Co., L.P.*, 257 F.3d 273, 284 (3d Cir. 2001) (citing *Walton v. Mental Health Ass;n of Southeastern Pa.*, 168 F.3d 661, 670 (3d Cir. 1999))(emphasis in original).

The parties debate only whether the requested accommodation was reasonable. Shippensburg argues that Sheehan's suggested accommodation of work from home with others covering certain duties is unreasonable on its face because being present in-person is an essential function of the department secretary position job. Sheehan argues that the in-person components of her job were not "essential" and therefore, her requested accommodation was reasonable. Therefore, the court will determine whether being present in person was an essential function of the department secretary position.

The Third Circuit has clearly held that "employers are not required to modify the essential functions of a job in order to accommodate an employee." *Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 232 (3d Cir. 2000). To determine what is an essential function, the court turns to the relevant regulation, which provides:

> (2) A job function may be considered essential for any of several reasons, including but not limited to the following:
>
> (i) The function may be essential because the reason the position exists is to perform that function;

(ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

29 C.F.R. § 1630.2(n)(2).  The regulation also provides several pieces of evidence the court may consider, none of which are dispositive.  *Deane v. Pocono Medical Ctr.*, 142 F.3d 138, 148 (3d Cir. 1998).  These include:  "(1) '[t]he employer's judgment as to which functions are essential'; (2) '[t]he amount of time spent on the job performing the function'; and (3) '[t]he consequences of not requiring the [employee] to perform the function.'"  *Kiburz v. England*, 361 F. App'x 326, 333 (3d Cir. 2010) (quoting 29 C.F.R. § 1630.2(n)(3)).  While Plaintiff is correct that the court is not bound solely by the job description and the employer's judgment, these pieces of evidence remain relevant for consideration.  Thus, the court will consider all the evidence before it as to whether a reasonable jury could find that being in person is an essential function of the department secretary position.

First, there is the job description.  The court notes that there is no section or specification in the job description as to what is "essential."  However, the job description requires a multitude of in person functions, including:

Screens visitors and phone calls for the Department, notifies Chair of all department activity in regard to visitors and callers[;] [s]orts mail delivered to the office and routes it to the proper faculty[;] [r]esponsible

for department master key.  Request keys for faculty and staff.  Collect keys from faculty and staff when no longer within the department.

(Doc. 36-3, p. 2.)

Second, Dr. Morin, department chair, who was also Sheehan's direct supervisor, testified that the position of department secretary required a physical presence in the department.  (Doc. 36-1, p. 43.)  She testified that the department secretary was "the focal point of the office" and completed various in-person tasks such as:

> Directing students, faculty, visitors, processing, budget, ordering, receiving supplies, necessarily removing – going to the print shop to pick up supplies or forms, walking students to various parts of the department, getting students access to the elevators which were keyed at the time . . . It was walking and notifying, posting flyers, posting faculty not being able to come to class, notes on office doors, on classrooms.  It was answering the phone, answering email, directing students to me or other faculty, physically walking students and their families to other faculty's offices.

*Id.* at 121.

Third, there is some debate about how much of Sheehan's time was spent performing in-person tasks versus tasks that could be accomplished remotely.  Plaintiff approximates the in-person functions of her job accounted for no more than four hours.  (Doc. 38, ¶ 18.)  Defendants dispute that this was the time Sheehan approximated for posting flyers, rather than the totality of her in-person tasks.  (Doc. 41, pp. 9, 10.)  Drawing inferences in favor of Plaintiff as the nonmovant, the specific tasks Plaintiff needed to perform while in person occupied

a relatively small percentage of her time.  However, Sheehan's conclusions as to the time spent on specific tasks that could only be performed in person is only one factor for consideration.

Fourth and finally, Plaintiff has provided her conclusion that while under a flexible work policy, she "accomplished all of [her] essential job duties, despite the fact that students, faculty, and staff were on-campus."  (Doc. 38-5 ¶ 4.)

Taking all of the factors into consideration, no reasonable jury could find that being present in the office was not an essential function of the department secretary job.  Sheehan's evidentiary support for her argument that being in person was not an essential function consists of her opinion that she successfully fulfilled her job remotely and her conclusion as to how much time she spent performing certain in person tasks.  At this juncture, a plaintiff must provide more than her own opinions and conclusions, but rather, must provide evidentiary support. *Jutrowski*, 904 F.3d at 288–89.

Defendants have presented evidence that the department secretary was the focal point of the office and that Sheehan's physical absence required various other people to cover those functions.  Based on this evidence and not mere unsupported conclusions, no reasonable jury could conclude that being physically present was not an essential function of the department secretary position.  Thus, Sheehan's proposed accommodation of having others cover the in-person tasks is not

reasonable because it requires making accommodations for an essential function of her position.

Sheehan's request to work from home is more akin to a request for an exemption from an essential duty, rather than a request for an accommodation. *See Donohue v. Consol. Rail Corp.*, 224 F.3d 226, 323 (3d Cir. 2000) (holding that the "suggestion that someone could 'cover' for him is thus not an accommodation designed to help him perform an essential duty of the job. Rather, it is a request to be exempted from an essential duty.") Accordingly, Sheehan has failed to show that her requested accommodation was reasonable, and she has failed to make a prima facie showing on her ADA claim. Therefore, Shippensburg is entitled to summary judgment on Sheehan's PHRA, RA, and ADA claims.

## B. FMLA Retaliation Claim

In their opening brief, Defendants argue the merits of an interference with benefits claim under the FMLA, ultimately concluding that the medical certification submitted by Sheehan was insufficient to put Shippensburg on notice that Sheehan was eligible for FMLA leave. (Doc. 35, pp. 21, 22.) Defendants also argue that they are entitled to summary judgment on a retaliation claim regarding Sheehan's unemployment compensation because there is no evidence in the record that Shippensburg opposed Sheehan's unemployment compensation claim. (*Id.* at 22, 23.)

Plaintiff argues that Defendants are not entitled to summary judgment on a FMLA retaliation claim.  (Doc. 37, p. 25.)  The totality of her argument focuses on whether her FMLA request was the cause of the termination of her employment, specifically the temporal proximity between the two.  (*Id.*)  She contends that terminating her employment for failing to attend the PDC is pretext, and the discriminatory motivation for the termination of her employment is Shippensburg's "frustration" of having to "deal" with her ADA and FMLA requests.  (*Id.*)

In reply, Defendants discount a causal connection between Shippensburg's "frustration" with Sheehan's requests and her ultimate termination, as the email expressing said "frustration" was sent prior to Sheehan's request for FMLA leave. (Doc. 41, p. 20.)  Defendants also argue that any claims based on a retaliatory denial of unemployment compensation benefits are insufficient as they are only based on Sheehan's self-serving affidavit.  (*Id.* at 18, 19.)

The FMLA seeks to "balance the demands of the workplace with the needs of families" by "entitl[ing] employees to take reasonable leave for medical reasons."  29 U.S.C. § 2601(b)(1), (2).  To achieve these goals, the FMLA prohibits employers from interfering with rights granted by the statute in two ways. First, the FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or attempt to exercise, any right provided under this subchapter."  *Id.* § 2615(a)(1).  This is commonly called an

"entitlement" or "interference" claim. *Callison v. City of Phila.*, 430 F.3d 117, 119 (3d Cir. 2005). To show an interference claim, "the employee needs to show that [s]he was entitled to benefits under the FMLA and that [s]he was denied them." *Id.*

Second, the FMLA protects individuals from discrimination based on the exercise of their FMLA rights under its "retaliation" provisions. *See* 29 U.S.C. § 2615(a)(1)–(2); 29 C.F.R. § 825.220(c) ("An employer is prohibited from discriminating against employees . . . who have used FMLA leave."). To that end, employers cannot "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220(c). To show a claim for retaliation under the FMLA, a plaintiff must provide evidence that she (1) invoked her right to FMLA-qualifying leave, (2) suffered an adverse employment action, and (3) the adverse action was causally related to her invocation of rights. *Capps v. Mondelez Global*, 847 F.3d 144, 152 n.6 (3d Cir. 2017) (internal citations omitted).

As the elements of these two types of claims show, these are distinct claims. *Mascioli v. Arby's Restaurant Grp., Inc.*, 610 F.Supp.2d 419, 430 (W.D. Pa. 2009). In an interference claim, "[l]iability is not dependent upon discriminatory intent, but rather is based upon the act of interference itself. In contrast, an FMLA

retaliation claim is subject to the burden-shifting analysis under the framework set forth in *McDonnell Douglas*[.]" *Id.*

Although Defendants argue that Sheehan has failed to produce evidence to prove an interference claim, Plaintiff only makes arguments regarding the causation prong of an FMLA retaliation claim. Moreover, Sheehan specifically analyzes her claim under the *McDonnel Douglas* burden shifting analysis. (Doc. 37, p. 23.) Accordingly, the court will analyze her FMLA claim as only an FMLA retaliation claim.

As noted above, an FMLA retaliation claims requires a plaintiff to show an adverse action. Here, Sheehan must show that her termination was causally related to her invocation of her FMLA rights. To do so, a plaintiff "must point to evidence sufficient to create an inference that a causative link exists between her FMLA leave and [the adverse employment action]." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012). To establish the causative link, generally, a plaintiff must establish "either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Budhun v. Reading Hosp. and Med. Ctr.*, 765 F.3d 245, 258 (3d Cir. 2014) (internal quotation omitted). A "bright line rule as to what constitutes unduly suggestive temporal proximity" does not exist. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d

217, 233 (3d Cir. 2007). At the prima facie stage, courts have found temporal proximity sufficient to suggest a causative link when several days have elapsed between the protected activity and the adverse action. See, e.g., *Lichtenstein*, 691 F.3d at 307 (finding seven days unduly suggestive); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (finding two days unduly suggestive). However, "[t]he mere fact that [an] adverse employment action occurs after a protected activity will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Johnson v. Philadelphia Police Dep't*, No. CV 14-1036, 2015 WL 12914147, at *3 (E.D. Pa. July 20, 2015), *aff'd*, 657 F. App'x 83 (3d Cir. 2016).

Sheehan has failed to produce evidence showing that her termination was causally linked to her request for FMLA leave. The temporal proximity between her invoking her FMLA right and the termination of her employment is not unusually suggestive, as there was about a month in between her FMLA request and termination of her employment. Further, there is no evidence suggesting a pattern of antagonism or any other discriminatory purpose in the termination of Sheehan's employment. Sheehan points to one email chain in which HR personnel express frustration in the context of Sheehan's request for ADA leave and

questions regarding her use of annual leave.[6]  These emails occurred prior to

Sheehan's request for FMLA leave and, as such, shed little light as to whether her

request for FMLA leave caused the termination of her employment.  While the

comments made by Browder and Porter are unbecoming, they are not

discriminatory against Sheehan for requesting FMLA leave.  There is no other

evidence connecting the termination of Sheehan's employment with her FMLA

request.  Accordingly, Sheehan has failed to produce evidence from which a jury

could find a prima facie case of FMLA retaliation.  Therefore, Defendants are

entitled to judgment as a matter of law.

### C.    Aiding and Abetting a PHRA violation

Because Plaintiff failed to establish a PHRA claim, her aiding and abetting

PHRA violation necessarily fails.  *Smith v. Univ. of Scranton*, 770 F.App'x 23, 27

(3d Cir. 2019).  Browder and Porter are entitled to judgment as a matter of law on

this claim as well.

---

[6] Specifically, in a private email referencing the email chain in which Sheehan was submitting paperwork and noting her dislike of providing personal information to her employer, Porter emailed Browder "Are you beating your head against a wall yet?!" after multiple exchanges between Sheehan and Browder regarding Sheehan's request for an accommodation under the ADA.  (Doc. 41-1, p. 2.)  Browder replied with a gif of a woman banging her head against a wall.  (*Id.*)

## CONCLUSION

Defendants are entitled to judgment as a matter of law on Sheehan's PHRA, ADA, and FMLA claims because there is no genuine dispute of material fact from which a reasonable jury could find for Sheehan.  An order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: July 7, 2025